# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**BRENDA ALLEN**,

        Plaintiff,

                                            No. 2:13-cv-13331

vs.                                         Hon. Gerald E. Rosen

**SPIRIT AIRLINES, INC.**,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION TO DISMISS

## I. INTRODUCTION

In this one-count negligence action, Plaintiff Brenda Allen claims that Defendant Spirit Airlines is responsible for her injuries resulting from a blog clot that formed in her left leg after her flight experienced a two-plus hour flight delay on the tarmac at Detroit Metropolitan Airport.   After removing this case from Michigan state court, Defendant moved to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).   Having reviewed and considered Defendant's Motion and supporting brief, Plaintiff's response thereto, and the entire record of this matter, the Court has determined that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process.  Therefore, the Court

will decide this matter "on the briefs."   See Eastern District of Michigan Local Rule 7.1(f)(2).  The Court's Opinion and Order is set forth below.

## II. PERTINENT FACTS

Plaintiff was a passenger on a June 19, 2010 Spirit Airlines flight from Detroit, Michigan to Atlantic City, New Jersey.  (Plf's Compl., Dkt. # 1, ¶ 4).  She boarded the flight at approximately 6:00 a.m. for its scheduled 6:45 a.m. departure.  (*Id.* at ¶ 8).  The flight did not take off at 6:45.  Rather, the flight was delayed for more than two hours waiting for the pilot to arrive due to a strike by Defendant's employees.  (*Id.* at ¶¶ 9-10).  During this delay, "Defendant's employees [advised] that she was not allowed to move about the airplane and was to stay seated to await departure."  (*Id.* at ¶ 11).  As a result, "Plaintiff developed a serious blood clot in her left leg, requiring surgery."  (*Id.* at ¶ 12).  Plaintiff therefore claims that "Defendant's negligence was the proximate cause of Plaintiff's serious injuries."  (*Id.* at ¶ 13).

In support of her negligence claim, Plaintiff asserts that Defendant owed her a duty of care as a business invitee and as a passenger, and that Defendant violated its duty of care in the following ways:

- Fail[ed] to properly train its employees and agents to appropriately assess potential injuries caused by a delay;

- Fail[ed] to properly train American[1] employees and agents to appropriately manage delays;
- Unreasonably hir[ed] or retain[ed] employees and agents who were not qualified to assess, manage, and investigate delays and the potential injury such a delay might cause;
- Fail[ed] to supervise American employees and agents in order to prevent potential injuries caused by a delay;
- Failed to repair and/or correct and/or warn of any hazardous and/or dangerous conditions, of which the Defendant, its agents, servants, and/or employees had knowledge, or should have had knowledge, by a reasonable and proper inspection;
- Failed to instruct all of its agents, and/or employees on the proper care and maintenance of its premises, and/or in the reporting of dangerous and/or hazardous conditions on Defendant's premises;
- Failed to provide rules, procedures and/or provide for periodic safety inspections for the discovery and/or correction of dangerous and hazardous conditions on Defendant's premises;
- Failed to construct Defendant's premises in a manner suitable and safe under the circumstance;
- Failed to observe all the duties of care imposed upon Defendant bythe (sic) statutes of the State of Michigan, Ordinances of the City in which Defendant's premises are located and the common law in such case made and provided;
- Others to be determined as discovery reveals.

(*Id.* at ¶ 16(a-j)).  Plaintiff then asserts that she "sustained personal injuries as a direct and proximate result of Defendants' (sic) negligence as alleged herein."  (*Id.* at ¶ 17; *see also* ¶¶ 18-21).

    In lieu of filing an answer, Defendant moved to dismiss Plaintiff's Complaint.   (Def's Mtn., Dkt. # 3).   First, Defendant asserts that Plaintiff's Complaint lacks sufficient factual allegations to state a claim under Federal Rule of

---

[1] The Court assumes that this reference -- and Plaintiff's subsequent mention of "American" -- is a typo and that Plaintiff intended to reference Spirit Airlines here.

Civil Procedure 12(b)(6).  Second, Defendant argues that Plaintiff's claim is both expressly preempted by the Airline Deregulation Act of 1968 (ADA), 49 U.S.C. § 41713, and implicitly preempted by the Federal Aviation Act (FAA), 49 U.S.C. § 40101.  As set forth in more detail below, the Court finds that the Federal Aviation Act and applicable regulations implicitly preempt Plaintiff's claim and therefore GRANTS Defendant's Motion to Dismiss.

## III. DISCUSSION

### A.    Standard of Review

In deciding a motion brought under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to Plaintiffs and accept all well-pled factual allegations as true.  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).  To withstand a motion to dismiss, however, a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The factual allegations in the complaint, accepted as true, "must be enough to raise a right to relief above the speculative level," and must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility of an inference

4

depends on a host of considerations, including common sense and the strength of competing explanations for defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

The Sixth Circuit has emphasized that the "combined effect of *Twombly* and *Iqbal* [is to] require [a] plaintiff to have a greater knowledge . . . of factual details in order to draft a 'plausible complaint.'" *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (citation omitted). Put another way, complaints must contain "plausible statements as to when, where, in what or by whom," *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373 (6th Cir. 2011), in order to avoid merely pleading an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

## B. The Federal Aviation Act implicitly preempts Plaintiff's negligence claim

A federal statute need not expressly preempt state law for the preemption doctrine to apply. *Chase Bank USA, N.A., v. City of Cleveland*, 695 F.3d 548, 554 (6th Cir. 2012).[2]   This is because "Congress' intent may be . . . 'implicitly

---

[2] Because this Court concludes that the FAA implicitly preempts Plaintiff's negligence claim, it is unnecessary to determine whether the Airline Deregulation Act expressly preempts Plaintiff's claim. This is especially true because -- though not noted by either party -- the circuits are currently split as to the breadth of the ADA's preemption clause, with the Sixth Circuit not yet having weighed in. *See Universal Coin and Bullion, Ltd. v. FedEx Corp.*, --- F. Supp. 2d ---, 2013 WL 5173547 (W.D. Tenn. 2013) (discussing the circuit split, noting that "[t]he Sixth

contained in [a statute's] structure and purpose.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citation omitted). Under the implied preemption doctrine, federal law acts to preempt state law in two ways: "field" preemption and "conflict" preemption. *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 583-84 (6th Cir. 2013). Field preemption occurs "where 'pervasive' federal regulation 'preclude[s] enforcement of state laws on the same subject.'" *Id.* at 583 (citation omitted and alteration in original). Conflict preemption is as it sounds, "nullif[ying] state law 'to the extent that it actually conflicts with federal law.'" *Id.* at 584 (citation omitted). As set forth below, binding Sixth Circuit authority and persuasive authority from other circuits dictates a finding that the Federal Aviation Act and the Federal Aviation Administration's regulatory scheme concerning airline safety and tarmac operations implicitly preempt Plaintiff's negligence claim.

### a.   Preemption in aviation safety

In *Greene v. B.F. Goodrich Avionics Systems, Inc.*, 409 F.3d 784 (6th Cir. 2005), the Sixth Circuit adopted the "Third Circuit's reasoning in *Abdullah* [*v. American Airlines, Inc.*, 181 F.3d 363 (3d. Cir. 1999),] that federal law establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation." *Greene*, 409 F.3d at 795. Stated differently, "Congress intended aviation safety to be exclusively federal in nature." *Id.* at 794. Accordingly, the

Circuit has not decided when to apply the ADA's preemption clause to state tort claims").

Sixth Circuit held that federal law preempted a negligence claim against an aircraft manufacturer for an alleged breach of a duty to warn of a gyroscope's manufacturing defect. *Id.* at 794, 795.

In so holding, the Sixth Circuit in *Greene* noted the Federal Aviation Act's legislative history:

> [The purpose of the Federal Aviation Act was to give] [t]he Administrator of the new Federal Aviation Agency full responsibility and authority for the advancement and promulgation of civil aeronautics generally, including promulgation and enforcement of safety regulations.

*Id.* at 794 (citing H.R.Rep. No. 2360, reprinted in 1958 U.S.C.C.A.N. 3741) (alterations in original). "The House Report also noted that '[i]t is essential that one agency of government, and one agency alone, be responsible for issuing safety regulations if we are to have timely and effective guidelines for safety in aviation.'" *Id.* (citations omitted).

Drawing on this and other legislative history, the Third Circuit in *Abdullah* concluded that "Congress intended to rest sole responsibility for supervising the aviation industry with the federal government." *Abdullah*, 181 F.3d at 368. This includes, for example, the Federal Aviation Administration's implementation of "a comprehensive system of rules and regulations . . . promot[ing] flight safety." *Id.* at 369. Accordingly, the Third Circuit in *Abdullah* -- in a case involving a negligence claim by passengers injured by turbulence -- found that Congress

implicitly preempted "*any* state or territorial standards of care relating to aviation safety." *Id.* at 371.  This is not to say that there are *no* standards of care relating to aviation safety.  Rather, as the *Abdullah* court makes clear and as the Sixth Circuit in *Greene* expressly holds, "*federal law* establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation." *Greene*, 409 F.3d at 795 (emphasis added); *Abdullah*, 181 F.3d at 371 ("[W]here there is no specific provision or regulation governing air safety, [the regulations governing "Careless and Reckless Operation," 14 C.F.R. § 91.13] provide a general description of the standard for the safe operation of aircraft.").  Therefore, under *Abdullah* as adopted by *Greene*, "traditional state . . . law remedies continue to exist" based upon violations of the *federal* standard of care.  *Abdullah*, 181 F.3d at 375.

The *Abdullah* and *Greene* decisions do not stand alone.  Other circuits have also concluded that Congress implicitly preempted the entire field of aviation safety.  *See Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Com'n*, 634 F.3d 206, 210 (2d Cir. 2011) ("[We had previously] stopped short of formally holding that Congress intended to occupy the field of air safety.  Today we join our sister circuits."); *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010) ("Based on the FAA's purpose to centralize aviation safety regulation and the comprehensive regulatory scheme promulgated

pursuant to the FAA, we conclude that federal regulation occupies the field of aviation safety to the exclusion of state regulations."); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 473 (9th Cir. 2007) ("We similarly hold that federal law occupies the entire field of aviation safety. Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, the dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety."); *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 6 (1st Cir. 1989) ("We infer from the Federal Aviation Act an unmistakably clear intent to occupy the field of pilot regulation related to air safety, to the exclusion of state law.").[3]

### b.      Deep Vein Thrombosis litigation in other circuits

Deep Vein Thrombosis (DVT) "occurs when a blood clot develops in a deep vein, usually in the leg.  It can cause serious complications if the clot breaks off

---

[3] To be sure, subsequent decisions from these circuits have reiterated that these cases cannot be interpreted as "expansively holding that the FAA preempts *all* state law personal injury claims.  Rather, . . . where there are pervasive regulations in an area . . . , the FAA preempts all state law claims in *that* area."  *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1004 (9th Cir. 2013) (internal quotations and citations omitted).  But, in cases where there are not pervasive regulations -- like the regulation of airstairs in connection with loading and unloading functions -- the FAA does not preempt state law claims.  *See Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 812 (9th Cir. 2009); *Elassaad v. Indep. Air Inc.*, 613 F.3d 119, 129 (3d Cir. 2010) (no implied preemption for negligence claim during unloading because "the regulations under the Aviation Act do not specifically regulate the conduct of the crew in connection with the loading or unloading of passengers.").

and travels to the lungs or brain." *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 381-82 (5th Cir. 2004). Though the Sixth Circuit has not addressed the issue, the Fifth and Ninth Circuits have specifically examined the implied preemption doctrine in relation to DVT claims arising out of air travel. *See id.*; *Montalvo*, 508 F.3d at 473. In *both* cases, the courts held that the federal regulatory scheme concerning air safety preempted such claims. Because these cases fundamentally undermine Plaintiff's claim, the Court discusses each in some detail.

In *Witty*, the plaintiff alleged, as pertinent here, that "Delta was negligent in failing to warn passengers about the risk of DVT" and in "failing to allow [passengers] to exercise their legs." 366 F.3d at 382 (alteration in original).[4] After reviewing the Federal Aviation Administration's regulatory scheme concerning air safety, the Fifth Circuit held "that federal regulatory requirements for safety warnings and instructions are exclusive and preempt all state standards and requirements." *Id.* at 385. This is because "[t]he FAA not only authorizes but affirmatively directs the Administrator of the Federal Aviation Administration to promulgate air safety standards and regulations," which the Administrator has done:

---

[4] The plaintiff also asserted that Delta failed to provide "adequate leg room to prevent DVT." *Id.* at 382. The Fifth Circuit found that the ADA expressly preempted this allegation because "requiring more leg room would necessarily reduce the number of seats on the aircraft, such a requirement would impose a standard 'relating to a price' under [49] § 41713(b)(1)." *Id.* at 383.

> [T]he Federal Aviation Administration has issued a broad array of
> safety-related regulations codified in Title 14 of the Code of Federal
> Regulations. These regulations cover airworthiness standards, crew
> certification and medical standards, and aircraft operating
> requirements. The regulations include a general federal standard of
> care for aircraft operators, requiring that "[n]o person may operate an
> aircraft in a careless or reckless manner so as to endanger the life or
> property of another."

*Id.* at 384 (citing 14 C.F.R. § 91.13(a)) (alterations in original). There are also a "number of federal regulations governing the warnings and instructions which must be given to airline passengers . . . [that are] familiar to all domestic air travelers" concerning smoking, the "fasten seat belt" sign, and other safety issues raised by air travel. *Id.* In sum, "Congress enacted a pervasive regulatory scheme covering air safety concerns that includes regulation of the warnings and instructions that must be given airline passengers." *Id.* at 385.

Applying these general principles to the plaintiff's claims that Delta should have warned passengers about the risk of DVT and that it should have allowed passengers to exercise their legs,[5] the Fifth Circuit pointed to the potential conflict between state tort law and federal regulations:

---

[5] In a footnote, the Fifth Circuit stated that its analysis regarding Delta's alleged "failure to warn" applied equally to the plaintiff's claim that Delta failed to allow passengers to exercise their legs:

> The complaint, by alleging that Delta was negligent in "failing to allow [passengers] to exercise their legs," might be construed as asserting a separate "failure to instruct" claim that passengers were not advised to move about the cabin or were instructed verbally or by

> Allowing courts and juries to decide under state law that warnings should be given in addition to those required by the Federal Aviation Administration would necessarily conflict with the federal regulations. In this case, the conflict is more than theoretical, since Witty claims that a DVT warning should have been given, while federal regulations do not require such a warning. And any warning that passengers should not stay in their seats, but should instead move about to prevent DVT, would necessarily conflict with any federal determination that, all things considered, passengers are safer in their seats.

*Id.* Finally, and distinguishing slightly from *Abdullah*, the Court concluded by declining to "decide whether a state claim for failure to warn passengers of air travel risks is entirely preempted, or, as [*Abdullah*] held, is preempted to the extent that a federal standard must be used but that state remedies are available." *Id.* Instead, the Fifth Circuit found that "any such claim must be based on a violation of federally mandated warnings" and that because "federal regulations do not require warnings to passengers about the risks of DVT or methods for preventing this condition . . . , Delta therefore cannot be held liable for failing to provide warnings or instructions to Witty." *Id*; *see also Miezin v. Midwest Ex. Air., Inc.*, 284 Wis. 2d 428, 434-41 (Wis. Ct. App. 2005) (adopting *Witty's* reasoning to find

---

> the seat belt sign to remain in their seats. We conclude however that the preemption analysis of such a claim is essentially identical to the analysis of a failure to warn claim, and our discussion of the latter is intended to cover both claims.

*Id.* at 383 n.3 (alterations in original).

plaintiff's claim regarding an airline's failure to warn about the risks of deep vein thrombosis to be implicitly preempted).

A few years later in *Montalvo*, the Ninth Circuit came to the same conclusion regarding claims concerning failing to warn about the risk of developing DVT during air travel. In that case, the plaintiffs asserted that the defendant airlines: (1) "were aware or reasonably should have been aware that long-distance air travel can cause DVT and that resulting blood clots can sometimes result in serious injury or death;" (2) "were aware of several measures that could prevent passengers from incurring DVT, such as walking around the cabin, exercising the legs while seated, or wearing special stockings;" and (3) that "[d]espite this alleged knowledge, the Airlines gave no warnings regarding DVT." *Montalvo*, 508 F.3d at 469.[6]  As with *Abdullah*, *Witty*, and the other circuit decisions referenced above, the Ninth Circuit also engaged in a significant analysis of the FAA and its regulatory scheme to find that Congress intended "to occupy exclusively the entire field of aviation safety and carry out Congress' intent to preempt all state law in this field." *Id.* at 471.

---

[6] Similar to the *Witty* plaintiffs, the plaintiffs in *Montalvo* also made a claim concerning seat configuration. The Ninth Circuit declined to find that this claim was expressly preempted by the ADA on procedural grounds -- there was no evidence concerning whether "seat[] reconfiguration would result in a significant effect on airline ticket prices or would interfere with the forces of competition." *Id.* at 475.

Consistent with *Witty*, the Ninth Circuit found pertinent that "a number of specific federal regulations govern the warnings and instructions which must be given to airline passengers. . . . The comprehensiveness of these regulations demonstrates that the Administrator has exercised his authority to regulate aviation safety to the exclusion of the states." *Id.* at 472-73. And, a finding that Congress "did not impliedly preempt state requirements for passenger warnings," continued the Ninth Circuit, would mean that "each state would be free to require any announcement it wished on all planes arriving in, or departing from, its soil, or to impose liability for the violation of any jury's determination that a standard the jury deems reasonable has been violated. Such a 'patchwork of state laws in this airspace . . . would create a crazyquilt effect.'" *Id.* at 473 (citation omitted and omission in original). The Ninth Circuit then joined the Third Circuit in *Abdullah* to find that "federal law occupies the entire field of aviation safety." *Id.* Accordingly, "because there is no federal requirement that airlines warn passengers about the risk of developing DVT, [the plaintiffs'] negligence claim fail[ed] as a matter of law." *Id.* at 474; *see also Twardowski v. American Airlines*, 535 F.3d 952, 961 (9th Cir. 2008) ("[A]irlines have no duty to warn of the risks of DVT.").

### c.     Tarmac Delay Regulations

Federal regulations concerning "lengthy tarmac delays" became effective on April 29, 2010, before the events of this lawsuit. 14 C.F.R. § 259.1-.7. "The

14

purpose of [these regulations] is to mitigate hardships for airline passengers during lengthy tarmac delays and otherwise to bolster air carriers' accountability to consumers." § 259.1. These regulations were adopted not only due to delays associated with "weather problems," but also due to "a number of factors besides weather, such as capacity and operational constraints." Enhancing Airline Passenger Protections, 73 Fed. Reg. 74586, 74586 (Dec. 8, 2008); 74 Fed. Reg. 68983, 68983 (Dec. 30, 2009).

A "[t]armac delay means the holding of an aircraft on the ground either before taking off or after landing with no opportunity for its passengers to deplane." § 259.3.[7] These regulations set forth, in great detail, a covered airline's obligations to develop a "Contingency Plan for Lengthy Tarmac Delays," which at the minimum must include the following:

> (1) For domestic flights, assurance that the air carrier will not permit an aircraft to remain on the tarmac for more than three hours [with some exceptions]:

> * * *

> (3) For all flights, *assurance that the air carrier will provide adequate food and potable water no later than two hours after the aircraft leaves the gate (in the case of departure)* or touches down (in the case of an arrival) if the aircraft remains on the tarmac, unless the pilot-in-command determines that safety or security considerations preclude such service;

---

[7] Other provisions of these regulations were subsequently amended in 2011 and 2012. The Court provides reference to those regulations in effect on June 19, 2010.

(4) For all flights, *assurance of operable lavatory facilities, as well as adequate medical attention if needed, while the aircraft remains on the tarmac*;

(5) Assurance of sufficient resources to implement the plan; and

(6) Assurance that the plan has been coordinated with airport authorities at all medium and large hub airports that the carrier serves, including medium and large hub diversion airports.

§ 259.4 (emphasis added).  Another aspect of these regulations is the obligation to develop a "Customer Services Plan" to address each of the following subjects:

(1) Offering the lowest fare available;
(2) Notifying consumers of known delays, cancellations, and diversions;
(3) Delivering baggage on time;
(4) Allowing reservations to be held without payment or cancelled without penalty for a defined amount of time;
(5) Providing prompt ticket refunds;
(6) Properly accommodating passengers with disabilities and other special-needs, including during tarmac delays;
(7) *Meeting customers' essential needs during lengthy tarmac delays;*
(8) Handling "bumped" passengers with fairness and consistency in the case of oversales;
(9) Disclosing travel itinerary, cancellation policies, frequent flyer rules, and aircraft configuration;
(10) Ensuring good customer service from code-share partners;
(11) Ensuring responsiveness to customer complaints; and
(12) Identifying the services it provides to mitigate passenger inconveniences resulting from cancellations and misconnects.

§ 259.5 (emphasis added).  These Contingency and Customer Service plans must be available on an airline's website.  § 259.6.  Finally, the regulations mandate that airlines designate an employee to monitor the effects of flight delays, cancellations,

16

and lengthy tarmac delays on passengers and to provide consumers with an avenue to complain about "its scheduled service," to be acknowledged within 30 days and substantively responded to within 60 days.  § 259.7.

There are very few cases discussing the interplay between tarmac delays and preemption.   The leading case in this regard is *Air Transport Association of America, Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008).   In that case, the Second Circuit addressed the state of New York's "Passenger Bill of Rights," which mandated that airlines take similar actions to those now required by the Tarmac Delay Regulations -- providing delayed passengers with fresh air and lights, waste removal service, and adequate food and drinking water.  *Id.* at 220.  The Second Circuit held that "requiring airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays does relate to the service of an air carrier and therefore falls within the express terms of the ADA's preemption provision."  *Id.* at 223.   In dicta, the Second Circuit indicated that it believed implied preemption also applied.   After referencing the general state of the law discussed above concerning field preemption of air safety, the Second Circuit noted the following:

> If New York's view regarding the scope of its regulatory authority carried the day, another state could be free to enact a law prohibiting the service of soda on flights departing from its airports, while another could require allergen-free food options on its outbound flights, unraveling the centralized federal framework for air travel.  On this point, the decisions of the Fifth and Ninth Circuits [in *Montalvo* and

17

*Witty*] finding preemption of state common law claims for failure to warn of the risk of deep vein thrombosis are instructive.

*Id.* at 225.  It, however, declined to "address the scope of any FAA preemption" due to its express preemption holding.  *Id.*

More recently, a Northern District of New York Court in *Joseph v. JetBlue Corp.*, 2012 WL 1204070 (N.D.N.Y. April 11, 2012), addressed both express and implied preemption in relation to tort claims arising out of a tarmac delay.  In that case, the plaintiffs alleged that their seven-hour tarmac delay led to "inhumane and intolerable" conditions:

> Plaintiffs allege that . . . rolling power outages" left the aircraft in "total darkness" for periods of time; that JetBlue "ran out of supplies for its passengers" and they were "left without food and drinking water;" and that JetBlue failed to have "potable water supplies for proper functioning of lavatories and sinks."  Plaintiffs also allege that "passengers began to argue and fight with one another" and "physical and verbal violence between passengers was rampant."  The Captain of Flight 504 is heard on a recorded conversations with BDL air traffic control tower personnel asking for a police officer to come on board and, in another conversation, for a tow of the aircraft to a gate to disembark the passengers.

*Id.* at *1 (internal citations omitted).  Among their several claims, the plaintiffs asserted claims for false imprisonment, negligence, and negligent infliction of emotional distress.  *Id.* at *2.  The court characterized the Tarmac Delay Regulations as "comprehensive" and found that both express and implied preemption applied.  *Id.* at *6-9.

18

As to implied preemption, "Congress intended to occupy the field of passenger safety while planes are grounded on tarmacs." *Id.* at *7. Otherwise, allowing such claims would "subject airlines to a patchwork of obligations which might be contradictory to federal regulations." *Id.* (citing 14 C.F.R. § 139.329 (restricting runway/taxiway movements); 14 C.F.R. § 91.123(b) (requiring crew to comply with air traffic controller instruction); 14 C.F.R. § 91.3 (holding crew responsible for passenger safety); 14 C.F.R. § 121.533(d)-(e) (same); 14 C.F.R. § 121.317(b), (f) (restricting passenger movement)). Therefore, concluded the *Joseph* court, plaintiffs' challenge to the nature of amenities provided during the tarmac delay "has at its heart a challenge to the federal safety regulations that may require[] an airplane to remain on a tarmac for such a lengthy period of time until can be safely moved." *Id.* at *8. If the court were to permit such claims, it would "place airlines in the position of deciding whether to obey federal regulations and wait until they are allowed to deplane passengers, or to take matters into their own hands in order to avoid tort liability. The safety of the flying public clearly weighs against the latter, and points decidedly to ADA and implied FAA preemption." *Id.*

### d.      Application to Plaintiff's negligence claim

Given the compelling analysis of this case law, and the policy issues discussed in them, the Court concludes that Plaintiff's claim cannot proceed. Under *Abdullah* as adopted by *Greene*, any Michigan standard of care relating to

19

2:13-cv-13331-GER-MAR   Doc # 7   Filed 11/12/13   Pg 20 of 24   Pg ID 99

aviation safety is preempted.  Accordingly, the duties Plaintiff seeks to impose --
essentially, that Defendant had the duty to affirmatively prevent injuries allegedly
occasioned by the two-plus hour delay -- cannot be distinguished from the failure
to warn of DVT in *Witty* and *Montalvo*.  The federal regulatory scheme, as
discussed above, mandates a litany of safety-related warnings to passengers, but is
silent with respect to warning passengers regarding the possibility of DVT or
taking affirmative steps to prevent passengers from developing DVT.  Because
"federal regulations do not require warnings to passengers about the risks of DVT
or methods for preventing this condition . . . , [Defendant] therefore cannot be held
liable for failing to provide warnings or instructions to [Plaintiff]."  *Witty,* 366 F.3d
at 385; *Montalvo*, 508 F.3d at 474.  Extending Plaintiff's theory to its logical end,
necessary warnings under Michigan law "given in addition to those required by the
Federal  Aviation  Administration  would  necessarily  conflict  with  the  federal
regulations."  *Witty*, 366 F.3d at 385.

To the extent Plaintiff might claim that *Greene*, *Witty,* and *Montalvo* are
distinguishable because her lawsuit does not involve "in-flight safety" issues,[8] the
Tarmac  Delay  Regulations  close  the  door  on  her  claim.   The  Tarmac  Delay
Regulations  specifically  set  forth  Defendant's  obligations  while  "holding
[Plaintiff's] . . . aircraft on the ground . . . before taking off . . . with no opportunity

---

[8] Plaintiff did not, in fact, make such an argument.  Indeed, she does not even
address these cases at all.

for its passengers to deplane."  14 C.F.R. § 259.3.  Plaintiff's Complaint does not allege that Defendant failed to comply with these obligations.   First, Plaintiff alleged a delay of less than three hours, so the three-hour tarmac rule does not apply.  § 259.4(1).  Second, she has not alleged that her plane left the gate, let alone left the gate without providing her adequate food and potable water.  § 259.4(3).  Third, she has not alleged that Defendant failed to provide operable lavatory facilities or "adequate medical attention."  § 259.4(4).  Fourth, Plaintiff has not alleged that Defendant did not "meet[ her] essential needs during [the] lengthy tarmac delay."  § 259.5(7).[9]

To be sure, the Court cites these regulatory provisions not with the intent to exclude others.  Rather, these provisions forcefully illuminate the comprehensive nature of the Tarmac Delay Regulations and Defendant's obligations -- i.e., its duties -- to passengers during a tarmac delay.  Noticeably absent from these obligations are those which Plaintiff seeks to impose, such as mandating that airlines train employees to assess the potential for injuries caused by a delay and then affirmatively warning passengers about the dangers of injuries during a delay. In short, the scope of this regulatory scheme leads this Court to agree with the

---

[9] Her Brief indicates that Plaintiff "reported discomfort," but this allegation is not in her Complaint.  (Plf's Resp., Dkt. # 5, at 13).  And even if it were, this Court cannot then infer that this was a request for medical assistance, let alone a failure by Defendant to provide adequate medical attention or to meet her "essential needs."

*Joseph* court's reasoning and find that it is so comprehensive as to implicitly preempt Plaintiff's claim.

In conclusion, the Court observes that flowing from this analysis, and those of the courts cited herein, is some direction for addressing DVT claims such as Plaintiff's here.  It is not that the possibility of developing DVT on flights, or arising out of tarmac delays, is not a problem to be taken seriously.  Rather, the lesson here is that, given the comprehensive statutory and regulatory structure outlined here, the appropriate forum for addressing these issues is either Congress or the regulatory process.[10]

---

[10] It is, therefore, unnecessary to examine whether Plaintiff's Complaint satisfies *Twombly/Iqbal*.  Plaintiff's Response concerning these cases, however, does require a short rejoinder.  It has now been over four years since the Supreme Court carved *Twombly's* plausibility standard into stone with *Iqbal*.  Plaintiff twists Defendant's description of the pleading standards set forth in *Twombly* and *Iqbal* into the belief that these cases "operate in concert to murder notice-pleading by requiring a plaintiff to prove its claims in its complaint." (Plf's Br., Dkt. # 5, at 12).  Such hyperbolic and unhelpful language aside, the Court notes that the Sixth Circuit has repeatedly stated that "it would be 'inaccurate to read [*Twombly* and *Iqbal*] so narrowly as to be the death of notice pleading.'" *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) (alteration in original and citation omitted).  Rather, and consistent with the Defendant's correct articulation of the pleading standards post-*Twombly/Iqbal*, the Sixth Circuit has very recently stated that "[i]n the aftermath of [*Twombly* and *Iqbal*]:

> [A] plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint that the defendant violated the law.  Instead, the sufficiency of a complaint turns on its "factual content," requiring the plaintiff to plead enough "factual matter" to raise a "plausible" inference of wrongdoing.  The plausibility of an inference depends on a host of considerations,

# IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss [Dkt. # 3] is GRANTED with prejudice.

**IT IS SO ORDERED.**

Dated: November 12, 2013           **s/Gerald E. Rosen**
                                   **GERALD E. ROSEN**
                                   **CHIEF, U.S. DISTRICT COURT**

---

including common sense and the strength of competing explanations for the defendant's conduct.

*16630 Southfield Ltd. P'ship*, 727 F.3d at 504. It would behoove Plaintiff's counsel to spill less ink on this resolved issue and more on why her client's Complaint plausibly states a claim for relief. Indeed, much of her Complaint makes little effort to nudge past the line of conclusions towards the realm of plausibility. As evidence of this, one need look no further than her assertion that Defendant "[f]ailed to observe all the duties of care imposed upon Defendant bythe (sic) statutes of the State of Michigan, Ordinances of the City in which Defendant's premises are located and the common law in such case made and provided." One thing is clear post-*Twombly/Iqbal*: conclusory allegations like this one do not assist in nudging claims towards plausibility.

Finally, it is this Court's general practice to provide a plaintiff with an opportunity to amend her Complaint when faced with a dismissal that is readily curable because slight defects should not condemn an otherwise viable complaint. This practice need not be followed here, however, because amendment of Plaintiff's Complaint would be futile given the application of the preemption doctrine to Plaintiff's claim as discussed in text. *See, e.g., Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420-21 (6th Cir. 2000).

23

## CERTIFICATE OF SERVICE

**I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 12, 2013, by electronic and/or ordinary mail.**

**s/Julie Owens**_____
**Case Manager, 313-234-5135**

24